986 F.2d 1330
 140 P.U.R.4th 460, Util. L. Rep. P 13,923
 NORTHWEST PIPELINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Washington Natural Gas Company, Northwest Natural Gas
Company, ANR Pipeline Company, Intervenors.
 Nos. 91-9566, 91-9567.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 23, 1993.
 
 Eric Christensen (William S. Scherman, General Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., with him on the brief), Washington, DC, for respondent F.E.R.C.
 Toni Marie Sutliff (Steven W. Snarr, with her on the briefs), Salt Lake City, UT, for petitioner Northwest Pipeline Corp.
 Robert A. Nelson, Jr. (Timothy C. Bladek, of Stoel, Rives, Boley, Jones & Grey, Ted P. Gerarden, of Donelan, Cleary, Wood & Maser, and Andrea J. Chambers and Thomas F. Brosnan, of Gallagher, Boland, Meiberger & Brosnan, with him on the brief), of Stoel, Rives, Boley, Jones & Grey, Washington, DC, for intervenors.
 Before TACHA and McWILLIAMS, Circuit Judges, and O'CONNOR, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 Petitioner Northwest Pipeline Corporation ("Northwest") seeks review of two orders of the Federal Energy Regulatory Commission ("FERC") requiring Northwest to amend downward the take-or-pay surcharge that it charges its customers. Because we conclude that the issues Northwest raises in its petitions are not yet ripe for review, we dismiss the petitions for lack of jurisdiction.
 
 BACKGROUND
 
 2
 On August 7, 1987, FERC issued its Order No. 500 which promulgated new guidelines under which pipelines can recover take-or-pay costs incurred as a result of the deregulation of the natural gas industry in the 1980s. See Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol (Order No. 500), 52 Fed.Reg. 30,334 (1987) (codified in part at 18 C.F.R. § 2.104); see also Associated Gas Distribs. v. FERC, 824 F.2d 981, 995-96 (D.C.Cir.1987) (recounting the development of the take-or-pay problem). These guidelines permit a pipeline that agrees to absorb 25% to 50% of its take-or-pay costs to recover from its customers an equal percentage through a fixed surcharge and the remainder through either a commodity rate surcharge or a volumetric surcharge on total throughput. 18 C.F.R. § 2.104(a).
 
 
 3
 On March 31, 1989, Northwest filed tariff sheets to implement a mechanism to recover its take-or-pay costs pursuant to Order No. 500. It proposed to absorb 25% of its costs and to recover 25% through a fixed surcharge and 50% through a volumetric surcharge which Northwest denominated a Supplier Settlement Payment ("SSP") surcharge. FERC accepted the SSP surcharge on the condition that Northwest recalculate it to reflect the volumes underlying "its most recent Commission-approved rates" as required by 18 C.F.R. § 2.104(b). Northwest Pipeline Corp., 47 F.E.R.C. p 61,147 (1989). Northwest began collecting its SSP surcharge in the second quarter of 1989 and has made regular quarterly updates, all based on the throughput volume of 450 TBtu (trillion British thermal units) underlying the rates established in the settlement of Northwest's most recent general rate case ("General Rate Case"). See Northwest Pipeline Corp., 49 F.E.R.C. p 61,072 (1989) (approving contested settlement as modified).
 
 
 4
 On May 31, 1991, Northwest filed tariff sheets to restate its base tariff rates ("Restatement Filing"), thus initiating a rate restatement proceeding ("Restatement Proceeding"). Northwest sought to restate and continue in effect the base rates approved in the General Rate Case because its cost and revenue study indicated that its jurisdictional costs exceeded its jurisdictional revenues. The study also demonstrated that Northwest had moved 568.6 TBtu of natural gas through its pipeline during the year ending February 28, 1991. FERC accepted and suspended the Restatement Filing subject to refund and to conditions not at issue here. Northwest Pipeline Corp., 55 F.E.R.C. p 61,514 (1991).
 
 
 5
 On May 24, 1991, Northwest submitted a quarterly filing to update its SSP surcharge for the third quarter of 1991. On June 28, 1991, FERC accepted and suspended the filing, but ordered Northwest to recalculate the SSP surcharge by basing it on the 568.6 TBtu throughput volume disclosed in the Restatement Filing. Northwest Pipeline Corp., 55 F.E.R.C. p 61,525 (1991). Northwest sought rehearing, arguing that its proposed SSP surcharge was properly based on the 450 TBtu throughput volume underlying the rates established in the General Rate Case. FERC denied Northwest's motion, see Northwest Pipeline Corp., 56 F.E.R.C. p 61,424 (1991), and this appeal followed in Case No. 91-9566.
 
 
 6
 On September 6, 1991, Northwest submitted its corrected quarterly filing for the fourth quarter of 1991 and again relied on the 450 TBtu throughput volume underlying the rates established in the General Rate Case. On September 30, 1991, FERC accepted and suspended the filing, but again ordered Northwest to recalculate the SSP surcharge by basing it on the 568.6 TBtu throughput volume disclosed in the Restatement Filing. Northwest Pipeline Corp., Nos. TM92-2-37-000 and TM92-2-37-001, slip op. (Sept. 30, 1991). FERC rejected Northwest's request for rehearing and stay, Northwest Pipeline Corp., 57 F.E.R.C. p 61,194 (1991), and this appeal followed in Case No. 91-9567.
 
 
 7
 On October 15, 1991, Northwest filed motions for reconsideration and stay of FERC's order denying Northwest's motion for rehearing in the first case. While these motions were pending, Northwest complied with the initial orders in the two cases below by refiling its quarterly tariff sheets with the recalculated SSP surcharges.
 
 
 8
 On January 23, 1992, FERC issued its Order Denying Reconsideration and Stay and Accepting Compliance Filing, Northwest Pipeline Corp., 58 F.E.R.C. p 61,054 (1992). In that order, FERC summarized its reasons for requiring Northwest to recalculate its SSP surcharges. It conceded that "the 568.6 TBtu volume is not, strictly speaking, a volume which has been used to design Northwest's rates." It noted, however, that "Northwest's higher costs have been counterbalanced by increased volumes, thus making it possible for Northwest to forego" initiating a general rate case to increase its base rates. It concluded that if Northwest did not amend downward its SSP surcharge before the next general rate case, the substantially higher volume of gas it was moving would permit it to substantially overrecover its take-or-pay costs. Because this result would be "unjust and unreasonable," FERC ordered Northwest to amend its SSP surcharge. Finally, FERC reemphasized that use of the 568.6 TBtu figure was provisional. At the conclusion of the Restatement Proceeding, FERC would identify the proper throughput figure on which to base the SSP surcharges for the third and fourth quarters of 1991.
 
 
 9
 FERC subsequently filed a Motion for Leave to Issue Order, which this court granted on February 12, 1992. Consequently, Northwest currently is charging its SSP surcharges based on the 568.6 TBtu throughput volume disclosed in the Restatement Filing rather than on the 450 TBtu throughput volume underlying the rates established in the General Rate Case.
 
 
 10
 On December 18, 1992, after we heard oral argument in this case, FERC issued a letter order accepting and approving a settlement in the Restatement Proceeding. Northwest Pipeline Corp., 61 F.E.R.C. p 61,345 (1992). That order, which is now final, quotes the settlement which specifically provides:
 
 
 11
 "1.1 The suspended restated base tariff rates in effect as of July 1, 1991, will continue in effect until superseding rates are placed into effect. The cost of service and throughput volumes underlying these rates will be the cost of service and throughput volumes approved in [the General Rate Case], except for the throughput volumes used to calculate Northwest's SSP commodity charge, which remains an issue to be resolved in this proceeding."
 
 
 12
 Therefore, the volume underlying Northwest's current rates remains 450 TBtu. FERC emphasizes, and the settling parties agree, that the final appropriate volume underlying the SSP surcharge is not resolved by the settlement and is reserved for resolution at a later hearing ("SSP Hearing").
 
 DISCUSSION
 
 13
 Northwest's central argument is that 18 C.F.R. § 2.104(b), which states that "[a] pipeline's volume-based surcharges must be based on the volumes which underlie its most recent Commission approved rates," is a binding rule which precludes FERC from ordering Northwest to base its SSP surcharge on any figure other than the 450 TBtu underlying the rates established in the General Rate Case and now restated as a result of the recent settlement in the Restatement Proceeding.[1] Northwest further contends that even if § 2.104(b) is not a binding rule, FERC's orders unreasonably depart from prior precedent in violation of the Administrative Procedure Act, 5 U.S.C. § 706. See Grace Petroleum Corp. v. FERC, 815 F.2d 589, 591 (10th Cir.1987) (stating that agency may not depart from prior policy and precedent without providing a reasoned explanation); Pacific Gas & Elec. Co. v. Federal Power Comm'n, 506 F.2d 33, 38-39 (D.C.Cir.1974) (stating that agency must present evidence and reasoning to justify a challenged agency action not governed by a binding rule).
 
 
 14
 FERC counters by arguing that § 2.104(b) is not a binding rule but a policy statement from which it may depart if its literal execution leads to the imposition of unjust and unreasonable rates in contravention of section 4(a) of the Natural Gas Act, 15 U.S.C. § 717c(a). It justifies its departure from § 2.104(b) by contending that the 450 TBtu figure is so far below Northwest's actual throughput volume that use of that figure would yield unjust and unreasonable rates. As a threshold matter, however, FERC contends that this issue is not yet ripe for review under our decision in CSG Exploration Co. v. FERC, 930 F.2d 1477 (10th Cir.1991). We agree that the issue is not yet ripe for review.
 
 
 15
 Section 19(b) of the Natural Gas Act provides for judicial review of FERC orders:
 
 
 16
 Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the Court of Appeals for the United States....
 
 
 17
 15 U.S.C. § 717r(b). Although this provision does not expressly require that the issues presented be ripe for review, we have interpreted the term "aggrieved" to impose a ripeness requirement. See, e.g., National Ass'n of Regulatory Util. Comm'rs v. FERC, 823 F.2d 1377, 1381-82 (10th Cir.1987); see also CSG Exploration, 930 F.2d at 1482 (finding ripeness requirement in nearly identical provision of the Natural Gas Policy Act).
 
 
 18
 In CSG Exploration, we addressed a challenge to the validity of two generic rules that FERC had ordered an Administrative Law Judge to apply on rehearing. 930 F.2d at 1481-82. Before the rehearing was held, the parties appealed the order. Id. at 1482. In concluding that the issues were not ripe for review, we examined four factors identified by the Supreme Court in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), as useful in evaluating both " 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " CSG Exploration, 930 F.2d at 1482-83 (quoting Abbott Laboratories, 387 U.S. at 149, 87 S.Ct. at 1515). Those four factors are:
 
 
 19
 (1) whether the challenged agency action constitutes "final agency action" within the meaning of section 10 of the Administrative Procedures Act, 5 U.S.C. § 704; (2) whether the issues presented are purely legal; (3) whether the challenged agency action has or will have a direct and immediate impact upon the party seeking review; and (4) whether resolution of the issue will foster, rather than impede, effective enforcement and administration by the agency.
 
 
 20
 Id. at 1483. The first two factors address the fitness of the issues for judicial decision; the second two address the hardship to the parties of withholding review. Because no single factor is either necessary or sufficient to establish the ripeness of the issue for review, we must balance the factors before reaching our conclusion.[2]
 
 
 21
 We first consider whether FERC's action is a final action within the meaning of section 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 704. An "order of the agency is final for purposes of review when it imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process." Cities Serv. Gas Co. v. Federal Power Comm'n, 255 F.2d 860, 863 (10th Cir.), cert. denied, 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958). The inquiry is a "flexible" one that must take into account "pragmatic considerations." See FTC v. Standard Oil Co., 449 U.S. 232, 240, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980).
 
 
 22
 FERC's orders in this case possess attributes of both final and nonfinal orders. As the District of Columbia Circuit has made clear, the
 
 
 23
 quintessential reviewable order ... is a final determination by the Commission concerning the justness and reasonableness of the rate filing.... The decision to accept a rate filing, in contrast, is undeniably interlocutory. Acceptance of a filing decides nothing concerning the merits of the case; it merely reserves the issues pending a hearing.
 
 
 24
 Papago Tribal Util. Auth. v. FERC, 628 F.2d 235, 239-40 (D.C.Cir.), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).[3] FERC's orders accepting and suspending Northwest's tariff sheets updating the SSP surcharge for the third and fourth quarters of 1991 are much like the "undeniably interlocutory" acceptance of a rate filing. All are subject to the outcome of "a lengthy hearing during which all relevant legal and factual questions are aired" and an order that "disposes of all significant disputed issues on their merits and fixes the obligations of the parties." Id. at 239-40. As FERC noted in its orders, the outcomes of Northwest's SSP surcharge update filings were subject to the outcome of the Restatement Proceeding. Although FERC has since approved a settlement in the Restatement Proceeding, the actual throughput volume to be used to calculate the SSP surcharge remains subject to the SSP Hearing.
 
 
 25
 This case differs from the usual acceptance of a rate filing, however, because FERC will not reconsider the legality of its requirement that Northwest recalculate its SSP surcharge on the basis of the throughput volume ultimately established in the SSP Hearing.[4] Thus, to the extent that FERC has established the formula it will apply in fixing Northwest's SSP surcharges, its orders accepting the update filings are final. The SSP Hearing will establish only the proper figures to be entered into that formula. See Phillips Petroleum Co. v. Federal Power Comm'n, 227 F.2d 470, 475 (10th Cir.1955), cert. denied, 350 U.S. 1005, 76 S.Ct. 649, 100 L.Ed. 868 (1956) (finding FERC orders that established rates until changed by FERC pursuant to a pending hearing final); cf. Transcontinental Gas Pipe Line Corp. v. FERC, 866 F.2d 477, 480-81 (D.C.Cir.1989) (failing to resolve question of finality of order which reserved a single legal issue from reconsideration at pending hearing).
 
 
 26
 Although FERC's orders possess attributes of both final and nonfinal orders, we conclude that FERC's orders are not final within the meaning of Abbott Laboratories. Northwest challenges FERC's departure from § 2.104(b). To the extent that § 2.104(b) is a policy statement rather than a rule, this is a direct challenge to FERC's contention that it may depart from § 2.104(b) to avoid the imposition of an unjust and unreasonable rate. To address this challenge we necessarily would have to address whether use of the 450 TBtu figure would be unjust and unreasonable--a question we cannot resolve until we know the actual throughput volume established at the SSP Hearing. At that time, we will have a "quintessentially reviewable order" determining "the justness and reasonableness of a rate filing." Papago, 628 F.2d at 239. Therefore, we find that because FERC justifies its departure from § 2.104(b) as an action designed to avoid the imposition of unjust and unreasonable rates, its action will not be final until the SSP Hearing is concluded.
 
 
 27
 Abbott Laboratories next directs us to question whether the issues Northwest presents for review are purely legal. We conclude that they are not. Northwest first asks us to address whether § 2.104(b) is a binding rule from which FERC may not depart without following the course prescribed by the APA, 5 U.S.C. § 553. To resolve this issue, we would examine the precise language of Order No. 500, its evolution as it proceeded from a draft to a final order, and its subsequent application by FERC and by the courts. Such an inquiry would be well within our role as a reviewing court "to resolve the purely legal issues presented by the parties by reference to the relevant statutory language and applicable legal precedent." CSG Exploration, 930 F.2d at 1484.
 
 
 28
 Were we to conclude that § 2.104(b) is a policy statement, however, we would then consider whether FERC properly concluded that use of the 450 TBtu figure would lead to the imposition of unjust and unreasonable rates. Our examination of this second issue would be a question that "only [could] be answered based on a fully developed factual record." Id. Like the generic test we were asked to review in CSG Exploration, FERC's decision to depart from the literal language of § 2.104(b) involves "the application of complex standards to a specific factual situation." Id. Because Northwest's petitions raise an issue that is not "purely" legal, we conclude that the second Abbott Laboratories factor is not satisfied.
 
 
 29
 The third part of the Abbott Laboratories test directs us to consider whether FERC's orders have or will have a direct and immediate impact on Northwest. The parties agree that because Northwest currently is charging the recalculated SSP surcharge pending the outcome of the SSP Hearing, FERC's orders are having an immediate impact on Northwest. Our inquiry into the third factor, however, does not end there. We also must ask whether Northwest will have the opportunity to challenge FERC's orders in this court at a later time. See, e.g., Transcontinental Gas, 866 F.2d at 481; International Union, United Auto., Aerospace & Agric. Implement Workers v. Brock, 783 F.2d 237, 250-51 (D.C.Cir.1986); Pennzoil Co. v. FERC, 645 F.2d 394, 399-400 (5th Cir. May 1981). The "direct and immediate impact" thus must be "irreparable" to establish the third factor. CSG Exploration, 930 F.2d at 1486; Pennzoil, 645 F.2d at 399; cf. Papago, 628 F.2d at 240. Where, as here, the petitioner seeks review of an interlocutory order, the failure to demonstrate irreparable harm nearly always defeats review. See Papago, 628 F.2d at 240; Amerada Petroleum Corp. v. Federal Power Comm'n, 285 F.2d 737, 739 (10th Cir.1960).
 
 
 30
 We conclude that although FERC's orders are causing Northwest present injury, that injury can be remedied upon later review. At oral argument, the parties agreed that once the Restatement Proceeding established conclusively the appropriate SSP surcharge, Northwest would have been entitled to recover with interest any amounts that it may have underrecovered with the current SSP surcharge. The fact that the actual throughput volumes are now the subject of the SSP Hearing does not change our conclusion. If, at the conclusion of that hearing, FERC has not changed its position on the retroactive application of the throughput volumes established in the hearing, Northwest may seek review of FERC's final order. Upon that review, if we decide that FERC is in error, we may order FERC to permit Northwest to recover all of its underrecovered costs with interest. See United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order.") Because Northwest concedes this point, we conclude that it has failed to establish the third factor.
 
 
 31
 Finally, we address the question whether our review of FERC's orders will foster or impede effective enforcement and administration by the agency. In our examination of this factor, we are concerned most that " 'the agency should be given the first chance to ... apply [its] expertise.' " CSG Exploration 930 F.2d at 1486 (quoting McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969)). Northwest argued that our review would not impede FERC's administration because our determination would have no effect on FERC's examination of the volume issue in the then-pending Restatement Proceeding. Now that the volume issue is the subject of the SSP Hearing, we assume that Northwest contends that our determination will not affect that proceeding either. We disagree. Our inquiry into whether the 450 TBtu figure would lead to the imposition of unjust and unreasonable rates would require us to determine the actual throughput volumes. Because that question presently is before FERC in the SSP Hearing, our inquiry would invade FERC's fact-finding province, thus impeding FERC's enforcement and administration of the Natural Gas Act. We therefore conclude that the fourth factor also weighs against Northwest.
 
 
 32
 Because our examination of the four Abbott Laboratories factors demonstrates that the issues Northwest raises in its petitions are not fit for judicial decision and that Northwest will not suffer irreparable harm, we conclude that these issues are not yet ripe for review. Accordingly, we DISMISS the petitions for lack of jurisdiction.
 
 
 
 *
 Honorable Earl E. O'Connor, Senior District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 At oral argument, which was before FERC approved the settlement in the Restatement Proceeding, Northwest conceded that if its base rates were revised in the Restatement Proceeding, FERC could have ordered Northwest to use the throughput volume underlying the revised rates to establish future SSP surcharges. It argued, however, that FERC could not have used that figure to retroactively establish its SSP surcharge for the third and fourth quarters of 1991. Because the recent settlement does not alter Northwest's base rates or the volumes underlying those rates, this particular issue is now moot
 
 
 [2]
 In Abbott Laboratories, the Court did not have the opportunity to address the interplay of the four factors because the party seeking review was able to establish each of them. In CSG Exploration, however, we found the issue unripe because, although the agency action was final, the three other factors "counsel[ed] against judicial review." Id. at 1484. The import of our analysis in CSG Exploration is that we must weigh the factors to determine whether the issues presented are ripe
 
 
 [3]
 In Papago, the District of Columbia Circuit articulated a three part test for determining the reviewability of FERC actions:
 We must ask first whether the order is final; second whether, if unreviewed, it would inflict irreparable injury on the party seeking review; and third whether judicial review at this stage of the administrative process would invade the province reserved to the discretion of the agency.
 Id. at 239. Although the Papago court did not expressly rely on Abbott Laboratories, its test corresponds closely with the test we applied in CSG Exploration. See Mississippi Valley Gas Co. v. FERC, 659 F.2d 488, 498 & n. 18 (Former 5th Cir. Oct.1981) (applying Abbott Laboratories test and discussing Papago ).
 
 
 [4]
 FERC has twice denied rehearing and once denied reconsideration of its orders requiring Northwest to refile using the 568.6 TBtu figure. Although FERC's orders accepting the revised SSP surcharge update filings state that its acceptance "is without prejudice to any findings or orders which ... may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against your company," FERC conceded at oral argument that it will not reconsider its decision to depart from § 2.104(b)